**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3717-13T2

N.E., AS LEGAL GUARDIAN
FOR INFANT J.V.,

    Plaintiff-Respondent/
    Cross-Appellant,

v.

STATE OF NEW JERSEY DEPARTMENT
OF CHILDREN AND FAMILIES, DIVISION
OF YOUTH AND FAMILY SERVICES;
NUSSETTE PEREZ, and FELIX UMETITI,

    Defendants-Appellants/
    Cross-Respondents.

> **APPROVED FOR PUBLICATION**
>
> **April 4, 2017**
>
> **APPELLATE DIVISION**

---

Argued December 16, 2015 — Decided April 4, 2017

Before Judges Fuentes, Koblitz and Kennedy.

On appeal from Superior Court of New Jersey, Law Division, Essex County, Docket No. L-3980-10.

Edward J. Dauber argued the cause for appellants/cross-respondents (Greenberg Dauber Epstein & Tucker and Greenbaum Rowe Smith & Davis, attorneys; Mr. Dauber, Linda G. Harvey, Kathryn B. Hein and John D. North, on the brief).

David A. Mazie argued the cause for respondent/cross-appellant (Mazie Slater Katz & Freeman, attorneys; Mr. Mazie, of counsel and on the brief; David M. Estes, David M. Freeman and Beth G. Baldinger, on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

On January 10, 2012, J.V. pled guilty before the Law Division, Criminal Part to second degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), and fourth degree child abuse, N.J.S.A. 9:6-1, against his then four-month-old son J.V. ("Baby Jesse").[1] As required by Rule 3:9-2, J.V. described under oath the facts supporting his guilty plea. He testified that on the morning of July 16, 2009, Baby Jesse's mother, Vivian, "dropped [his] son off" at his apartment. J.V. admitted that "at this point in time," he was aware there was an order in effect from the Division of Youth and Family Services (the Division) prohibiting him from having "unsupervised contact" with Baby Jesse.

J.V. admitted that when his infant son began to cry, he shook him with great force, knowingly "disregarding the risk" that the child would be injured. Baby Jesse "slipped" from his hands and "fell to the floor . . . [and] hit his head." J.V. called 911 when he noticed Baby Jesse was not breathing. J.V. acknowledged that as a direct result of his actions, Baby Jesse was "seriously injured." N.J.S.A. 2C:11-1(b) defines "[s]erious bodily injury" as an injury "which creates a substantial risk of

---

[1] Pursuant to Rule 1:38-3(b)(9), we use fictitious names when needed to protect the privacy of the child victim.

death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ[.]"  It is undisputed that Baby Jesse suffered catastrophic injuries.[2]

It is also undisputed that after investigating a previous allegation of abuse, the Division had entered into a case plan agreement with Baby Jesse's mother, "Vivian," and maternal grandmother, N.E. (the child's legal guardian).  Both women agreed not to permit J.V. to have unsupervised access to Baby Jesse.  This agreement was in effect at the time J.V. physically assaulted his son, with one modification.  At Vivian's request, N.E. was replaced by the child's maternal grandfather, U.M. ("Ugo"), and his wife, L.M. ("Linda") as caretakers while Vivian was at work.

Vivian was on her way home from work when her stepmother, Linda, asked her for permission to leave Baby Jesse alone with J.V. to go wash her car.  Because Vivian thought she was approximately twenty minutes away from her home, she told Linda

---

[2] At the time of this civil trial, Baby Jesse was four years old. A pediatric neurologist testified he is unable to walk or speak, and has significant visual impairments.  "He has an active seizure disorder, which requires treatment with anti-seizure medications, is not able to eat, requires a feeding tube, and requires therapies to allow . . . his development to advance." A pediatric physiatrist opined these injuries were the result of "a neurologic insult from the shaken baby syndrome[.]"

it was alright.  Less than ten minutes later, Ugo called Vivian to tell her Baby Jesse was in the hospital.

Approximately four months before J.V. pled guilty, Baby Jesse's maternal grandmother, N.E.,[3] filed this civil action against the State of New Jersey, Department of Children and Families (the Division); Division caseworker Felix Umetiti; and Umetiti's supervisor, Nussette Perez.  In addition to these state government parties, plaintiff named as defendants Newark Beth Israel Medical Center, Overlook Medical Center, and a number of other professionals who provided medical services to Baby Jesse.  Plaintiff settled her claims against the non-public defendants for $7,000,000.  The net proceeds of the settlement were used to establish an annuity and special needs trust for the benefit of Baby Jesse.[4]  Thus, this appeal concerns only the Division and its employees.

Plaintiff's claims against the Division are predicated on the doctrine of respondeat superior.  Plaintiff argues this

---

[3] N.E. does not have a direct claim in this suit.  However, because she is Baby Jesse's legal guardian, we will refer to her as "plaintiff."

[4] The record includes a copy of the May 29, 2013 Law Division order, which approved the minor's settlement and created the special needs trust.  Paragraph 11 awards plaintiff's attorneys 25% of "the net monies recovered in excess of $2 million."  It also directs Newark Beth Israel Hospital and an individual physician to pay $1,769,374.32 in legal fees and $139,169.37 in costs.

court must hold the Division vicariously liable for a series of discretionary decisions made by Division caseworker Umetiti and his supervisor while investigating plaintiff's allegations of child abuse and parental unfitness on May 28, 2009. Plaintiff alleged Umetiti and Perez negligently failed to remove Baby Jesse from his parents' custody, despite evidence showing his father was mentally unstable and physically abusive.

The Division argued before the trial court that the Torts Claims Act (TCA), N.J.S.A. 59:1-1 to -12-3, bars plaintiff's claims against Umetiti and his supervisor, because the decision on whether to remove a child from the care and custody of a parent or legal guardian inherently involves the exercise of human judgment and discretion. Under these circumstances, the TCA provides public employees with absolute immunity from civil liability. N.J.S.A. 59:3-2(a). At the charge conference, the Division also argued it was entitled to qualified immunity under N.J.S.A. 59:3-3. The trial judge rejected defendants' application as a matter of law and instructed the jury to consider the good faith immunity of N.J.S.A. 59:3-3 only with respect to certain aspects of the investigation. The trial court held the Division was subject to civil liability if it negligently performed or failed to perform any one of sixteen "ministerial tasks" while deciding whether to exercise its

discretionary authority to remove the child from his parents' custody.

The trial court also rejected the Division's argument for absolute immunity under N.J.S.A. 59:3-2(a), characterizing the Division's removal of a child from his parents' custody as a ministerial act that a jury can assess under an ordinary negligence standard. The court relied on Coyne v. DOT, 182 N.J. 481 (2005), to hold that the caseworker's decision to permit Baby Jesse to remain with his parents, conditioned upon plaintiff and the child's mother agreeing not to allow J.V. to have unsupervised access to the child, was not a discretionary act under N.J.S.A. 59:3-2(a) because "no high level policy making" was involved. The court noted that none of the Division employees were "the lead employee in the office, let alone[] the agency." Finally, the court held the jury was capable of determining whether the Division's decision was "palpably unreasonable." N.J.S.A. 59:3-2(d).

The case was tried before a jury for a period of approximately three weeks, spanning from November 19, 2013 to December 13, 2013. The jury found that in failing to remove Baby Jesse from his parents' home, the Division and its employees acted negligently. The jury further found that the Division's negligence served as the proximate cause of Baby

Jesse's injuries. An interrogatory on the verdict sheet read: "Did the DYFS defendants prove that leaving [Baby Jesse] in the home was not palpably unreasonable?" The jury unanimously responded: "No."

On the question of apportionment under the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.17, the Division presented evidence showing that on June 12, 2009 (five weeks before J.V. assaulted Baby Jesse), the Division had in place a safety plan that involved the voluntary participation of three key family members. In an effort to keep the family united, Ugo and Linda voluntarily agreed to care for Baby Jesse during the time Vivian was at work. The principal purpose of the plan was to never leave Baby Jesse alone in J.V.'s care.

Immediately after the jury announced its verdict on liability, the trial judge informed the jury that J.V. had also been found responsible for the harm to Baby Jesse. After the judge instructed the jury on the legal concept of apportionment, the court permitted counsel to present closing arguments limited to this question. The jury verdict sheet on apportionment required the jury "to allocate to each of the following the percentage by which that person or persons contributed to [Baby Jesse's] injuries:" the DYFS defendants (Umetiti, Perez, and Powell), J.V., Vivian, Linda, and Ugo.

The jury found the Division 100 percent liable and absolved the remaining parties of all liability. The verdict sheet reflects the jury specifically wrote "0" next to J.V.'s name, and crossed out the remaining names. On the question of damages, the jury awarded $105,000,000 to cover the cost of providing future medical services to Baby Jesse; $57,670,000 for pain and suffering; $1,410,343 for lost wages; and $1,892,160, representing the value of the services plaintiff had provided to Baby Jesse.

The trial judge thereafter entered judgment against defendants for $165,972,503, constituting the total damages described herein, plus $1,432,872.81 for satisfaction of a Medicaid lien. The judgment credited defendants with $7,475,000, representing the proceeds of the settlement plaintiff reached with the medical care providers. Defendants filed a motion for judgment notwithstanding the verdict, which the court denied. The court also denied defendants' motion for a new trial. The court partially granted defendants' motion for remittitur, reducing the damages for future medical expenses and life care to $75,868,321, or, at plaintiff's election, a new trial. In accordance with its decision on remittitur, the trial court entered a final judgment against the Division in the amount of $56,901,240 for future medical expenses; $43,252,500

for pain and suffering; $1,057,575.25 for loss of future income; and $1,419,120 for past services.

In this appeal, we are required to determine whether the State of New Jersey can be held vicariously liable for the catastrophic injuries Baby Jesse suffered as the result of his father's criminal act. The basis of liability is a caseworker's decision to explore the viability of a voluntarily adopted safety plan, rather than taking immediate action to remove the child from his parents' home without their consent. Based on these uncontested facts, we hold the Division caseworkers were entitled to judgment notwithstanding the verdict based on the qualified immunity afforded to public employees who act in good faith in the enforcement or execution of any law. See N.J.S.A. 59:3-3.

The decision to remove a child involuntarily from the custody of a parent or guardian is governed by a comprehensive statutory scheme. Plaintiff failed to establish, as a matter of law, that the decision the Division reached here was contrary to the law or lacking in subjective good faith. An ordinary negligence standard is an insufficient basis to impose civil liability on a public employee involved in the execution of the law. As a matter of public policy, the Legislature adopted the TCA to insulate the State from civil liability under these

circumstances.  For these reasons, we reverse the jury's verdict and vacate the final judgment entered against defendants in the amount of $165,972,503, as well as the $1,432,872.81 to satisfy the Medicaid claims.

I

May 28, 2009 Incident and Investigation

Vivian was eighteen years old when she gave birth to Baby Jesse in 2009.  She resided with plaintiff (her mother) and plaintiff's husband.  Vivian moved out of plaintiff's home when Baby Jesse was one month old.  She stayed with J.V. and the child's paternal grandmother for approximately one month, at which point she and J.V. found their own apartment.  Plaintiff took care of the child three or four times per week to enable Vivian to work at a Dunkin Donuts.

When Vivian dropped the baby off on May 28, 2009, plaintiff noticed he had bloodshot eyes and bruises on both cheeks. Plaintiff took the child to the Dunkin Donuts where Vivian worked to show her the injuries.  Plaintiff testified that Vivian began to cry and told her J.V. "was treating the baby badly."  Plaintiff reported the child's bruises and Vivian's allegations of abuse to the Division when she returned home. According to plaintiff's testimony, she also told the Division

10

she believed J.V. was "crazy," had "bipolar," was using illegal drugs, and was physically abusive to Vivian.

Caseworker Felix Umetiti was assigned to the Division's Union County office when he received the screening summary for the case on May 28, 2009 at 1:40 p.m. His title at the time was Family Service Specialist I, which involved "investigating cases assigned to [him], going out in the field to do the actual investigation, [and] get[ting] to know [the] collaterals within the time frame allotted . . . through the policy."

Nussette Perez was Umetiti's direct supervisor. Perez began working for the Division in 2000. She was in charge of the Division's Union County office at the time plaintiff called to report her allegations of abuse against J.V. As a supervisor, Perez was required to oversee the cases assigned to five caseworkers. These caseworkers carried a caseload ranging from twelve to twenty families. Perez's responsibilities included: (1) conducting pre and post-investigation conferences; (2) guiding and supervising the caseworkers as they gathered information; (3) reading and approving all investigation reports; (4) ensuring investigation reports were electronically entered into the Division's computer records; (5) ensuring risk assessments and contact sheets were properly recorded; and (6) ensuring compliance with Division timeframes.

11

According to procedure at that time, the Division had sixty days from May 28, 2009 to complete its investigation and make a determination as to what services it would provide the family and what legal action, if any, was required to ensure the family's safety. N.J.A.C. 10:129-5.3(c).[5] The initial part of the investigation was to occur within the first fourteen days. N.J.A.C. 10:129-2.8(b). The second phase required a formal investigation where the Division would interview more people, gather collateral information, and make assessments to determine what course of action was required. See N.J.A.C. 10:129-2.9.

Umetiti visited plaintiff's home on May 28, 2009. He met with plaintiff, plaintiff's husband, and Vivian. He also personally examined and photographed Baby Jesse, confirming the infant had visible bruises on his face and blood in his eyes. Plaintiff and Vivian then transported the baby to Newark Beth Israel Hospital, while Umetiti followed behind in a state-owned car.

At the hospital, plaintiff told Umetiti that she believed J.V. suffered from bipolar disorder. Plaintiff claimed J.V. was not taking any legitimate medication for his illness, relying instead on illicit drugs to self-medicate. Plaintiff also

---

[5] These regulations have been superseded by N.J.A.C. 3A:10-2.1 to -3.3; N.J.A.C. 3A:10-7.3.

claimed J.V. "used to beat up [his] ex-girlfriend[.]" Plaintiff told Umetiti that Vivian was afraid of J.V., and she showed him Vivian's bruises.

At the hospital, Umetiti also interviewed Vivian about Baby Jesse's injuries. Vivian told Umetiti she first noticed Baby Jesse had blood in his eyes on May 19, 2009. She took him to his pediatrician, who told her "that it will resolve itself within a couple of weeks[.]" According to Vivian, the doctor also told her that infants sometimes have this condition. However, on May 22, 2009, Vivian took the baby to another physician for a second opinion. This doctor told her to take her son to the hospital. Vivian followed the doctor's instructions and took Baby Jesse to Overlook Hospital in Union County. The hospital told her that Baby Jesse's condition could have been caused by sneezing, coughing or straining.

Umetiti also asked Vivian about J.V.'s behavior toward the baby. Umetiti testified that Vivian told him she had "never seen [J.V.] getting aggressive or losing patience around the child[.]" Vivian stressed that "he has never been a problem[.]" Umetiti asked Vivian about plaintiff's specific allegation that Vivian had seen J.V. shake the baby. Vivian flatly denied it. In fact, at no point during the entire investigation did Vivian

ever tell Umetiti that she was concerned about J.V. abusing the baby.

Umetiti also asked Vivian about domestic violence in connection with the bruise he saw on her arm. She denied any allegation of domestic violence and attributed the bruises to "rough sex." Given the seriousness of the allegations, Umetiti asked Vivian to repeat the responses she had given to him in front of her mother. Umetiti testified that Vivian again vehemently denied her mother's allegations. With respect to J.V.'s mental state, Vivian confirmed that he had been diagnosed with bipolar disorder "at the age of five." However, she did not know whether a physician was treating him at the time. Vivian told Umetiti that J.V. was not taking any medication. Although he used marijuana as a teenager, she did not know whether he was currently using drugs. Umetiti accepted Vivian's account of these events as truthful.[6]

The physician who examined Baby Jesse at Newark Beth Israel Hospital told Umetiti that a CT-Scan and other diagnostic tests showed no fractures or skeletal problems. The doctor's only

---

[6] On direct examination, Vivian admitted she lied to Umetiti about the nature of her bruises. The bruises were actually caused by J.V.'s abusive behavior towards her. Vivian also withheld from the Division that J.V. physically abused her on a regular basis and at least once threatened to kill her while holding a knife to her throat.

concern was the unexplained injury around the infant's neck area. Based on this, the doctor told Umetiti he "couldn't rule out possible child abuse and he suspected child abuse." The doctor did not testify at trial.

After this initial encounter, Umetiti personally visited Vivian and Baby Jesse on June 1, 2009, and June 12, 2009. He also received what he characterized as "regular reports" from plaintiff and Vivian confirming that Baby Jesse was "doing okay." Umetiti testified that on June 12, 2009, he met with Vivian, J.V., plaintiff, and plaintiff's husband at the Division's conference room to discuss a plan for the family to consider going forward. The family members agreed to a "case plan," which required J.V.'s cooperation and plaintiff and Vivian's active participation. Vivian agreed to care for her infant son during the day and to never allow J.V. to have unsupervised access to the child. Plaintiff agreed to care for her grandson at night when Vivian was at work.

Umetiti testified that he contacted his supervisor, Perez, to explain the details of the case plan and obtain her input and approval. Furthermore, he asked Perez to join him in the Division conference room when he met with the family to explain the case plan's conditions. Umetiti also wanted some form of

medical confirmation and explanation of J.V.'s psychiatric problems.

The terms of the case plan were memorialized in a document signed by all of the affected family members. Unfortunately, this document is not included in the appellate record. As described by Umetiti, the plan required J.V. and Vivian to submit to drug assessments. Vivian agreed to "have a responsible adult . . . supervise her son at all times[,]" and to allow her mother to babysit. The parties further agreed that J.V. "must not be left alone with his son . . . unsupervised at any time." The case plan made clear that if J.V. violated this condition, the Division would seek judicial authorization to remove the child from his parents' custody.

The case plan began on June 12, 2009 and was set "to expire" on June 30, 2009. When asked to explain the reasons for this eighteen-day limitation, Umetiti stated: "The 6/30 date I put there just to remind me . . . I have to revisit to see where we are with . . . the case, what's going on. Because . . . you can't leave it indefinitely." Umetiti also gave the following response when asked how this plan addressed the risk of harm to Baby Jesse.

> Q. Now, can you tell us how that addressed
> the risk . . . that this baby could be
> harmed[?]

16

A. The . . . fact that . . . all the
parties involved voluntarily agreed . . .
they would comply with the . . . plan. And
this [was] . . . [the] last chance to
maintain this child in his own family
environment.

Plaintiff confirmed that Umetiti told all those who signed the case plan that J.V. was not permitted to be alone with Baby Jesse. Although not explicitly stated, plaintiff inferred that as a signatory to the case plan, she was the only adult authorized to care for the baby while Vivian was at work. Thus, on the day she signed the case plan, plaintiff called Ugo and Linda to make sure they knew J.V. was not allowed to be alone with the baby. On cross-examination, plaintiff also testified that she told the manager of the Dunkin Donuts where Vivian worked that the Division was investigating the baby's bruises.

I told [the manager] listen, the baby appear
[sic] with bruises, okay? They investigates
[sic]. DYFS is investigating. If they find
out something they might remove the baby . .
. and I want to try to help her. And [the
manager] told me she haven't come here
[sic]. . . . I don't know what's wrong with
her[;] she's missing some days on the job.

[(Emphasis added).]

At the conclusion of their meeting on Friday, June 12, 2009, Vivian and J.V. left the Division conference room with Baby Jesse and thereafter refused to permit plaintiff to babysit. In fact, Vivian cut off all contacts with her mother

17

from this point forward. Plaintiff testified that she repeatedly attempted to contact Vivian over the weekend and received no response. Her phone calls rang unanswered without an automatic call-back message or personalized greeting. Plaintiff testified she decided to return to the Division's Union County office to inquire.

Plaintiff claimed she discussed the situation with a Division representative named Deborah Powell, who assured her she would investigate and "everything [was] going to be taken care of[.]" Powell testified to having no recollection of ever meeting plaintiff or discussing any aspect of the case with her. Plaintiff finally spoke to Umetiti who told her Vivian and J.V. had relocated to another apartment and he was not at liberty to disclose their location. Umetiti also told plaintiff that he had seen the baby.

Despite Vivian's wishes, plaintiff attempted to obtain legal custody of the child. Plaintiff also reported the matter to the Union County Prosecutor's Office (UCPO). Sergeant Joseph Genna of the UCPO Child Abuse Unit was assigned to investigate the matter. Genna testified that plaintiff told him "she had notified [the Division] and had not heard anything." Genna agreed with plaintiff's counsel that when a doctor believes "there's a suspicion of child abuse[,]" either the Division or

18                                                          A-3717-13T2

the hospital is required to contact the prosecutor's office. Genna did not provide any legal basis to support this contention.[7]

Sometime between June 17, 2009, and June 23, 2009, Genna contacted Umetiti, who sent him the Division report documenting plaintiff's initial allegations. Although the testimony concerning Genna and Umetiti's conversation is inconsistent, the record shows the Division had not yet completed its investigation. The UCPO did not file criminal charges against J.V. at this time.

On June 18, 2009, plaintiff called Umetiti and told him she had not seen the baby for six days. Although she did not have any evidence, she suspected J.V. was babysitting the child. That same day, Umetiti made a surprise visit to Vivian's apartment in response to plaintiff's concerns. He found Vivian, J.V., and the baby in the apartment. "The baby looked fine." Umetiti asked Vivian to explain why she was not bringing the baby to her mother as she had agreed to do in the case plan.

---

[7] N.J.S.A. 9:6-8.10 states: "Any person having reasonable cause to believe that a child has been subjected to child abuse or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise." (Emphasis added). The Supreme Court has construed this statute to impose a "universal obligation to report child abuse whenever a person forms a reasonable belief that a child has been subjected to child abuse." L.A. v. N.J. Div. of Youth and Family Servs., 217 N.J. 311, 316 (2014).

Vivian told him "she [couldn't] trust her mom anymore," because "she [didn't] know what her intentions [were]." According to Umetiti, Vivian feared her mother was plotting to take her son from her. She told Umetiti that plaintiff had gone to the Dunkin Donuts where she worked and told her manager that the Division was "in the process of taking her child away." Vivian told Umetiti that she was using her father and stepmother, who lived in Jersey City, to babysit while she was in school and at work.

Umetiti testified that while he was at the apartment, he asked Vivian to contact her father, Ugo. Umetiti spoke to Ugo and explained the situation to him. According to Umetiti's testimony, Ugo told him he had no problem babysitting his grandson. He also stated his wife Linda was willing to take on the responsibility when he was unavailable. Umetiti asked to speak to Linda, but Ugo told him she did not speak English. Umetiti asked Ugo to explain the situation to her and then listened while Ugo spoke to his wife in Spanish. During the phone conversation, Umetiti obtained Ugo and Linda's dates of birth and social security numbers for the purpose of conducting a criminal background check.

Umetiti documented the June 18, 2009 visit to Vivian's apartment in an initial contact sheet he created on June 23,

2009. The sheet showed Ugo and Linda's social security numbers and dates of birth, but did not contain any information regarding Umetiti's conversation with Ugo. At trial, Umetiti testified that he wrote this information in his notebook on July 20, 2009, four days after J.V. assaulted Baby Jesse.

On June 22, 2009, Umetiti filed an "urgent" referral request for a "needs assessment." When asked to explain why he had marked the request as "urgent," Umetiti stated: "[T]he thinking that went into that is the fact that [J.V.] was said to be bipolar." Umetiti also wanted to determine if the child needed additional services from the Division. On June 24, 2009, Umetiti reported to Vivian's apartment to perform the needs assessment. He was accompanied by Lorraine Perkins, a nurse employed by the University of Medicine and Dentistry of New Jersey (UMDNJ) and assigned under contract to the Division. The assessment was not done that day because Vivian had already taken the baby to her father's house and was preparing to leave for work.

Umetiti and Nurse Perkins returned to the apartment on June 26, 2009. They found the baby properly dressed. His eyes no longer exhibited the redness that prompted the hospital visit on May 28, 2009, and his bruises were barely visible. Nurse Perkins did not find any signs of injury or mistreatment.

Umetiti observed J.V. laying on a mattress and "relaxing." He did not exhibit any signs of inebriation, anxiety, or depression. Umetiti found that J.V.'s demeanor did not indicate any reason for concern. However, Umetiti also noticed J.V.'s indifference as to what was going on with his son. According to Umetiti, it was as if "he [didn't] want to be bothered with . . . what we [were] doing." The visit lasted between thirty to forty-five minutes.

Umetiti did not receive a written report memorializing Nurse Perkins's findings. Instead, they discussed their observations orally. Nurse Perkins noted the baby's eyes were "tracking[,]" meaning the child moved his eyes to follow items placed within his field of vision. The only concern Nurse Perkins raised related to the presence of a caged ferret. Vivian and J.V. reassured her that the animal was never let out of its cage.

Plaintiff testified that Umetiti called her to tell her Baby Jesse was fine. Plaintiff continued to call Umetiti each day and received the same answer: The investigation was not yet complete. On June 26, 2009, Umetiti told plaintiff he was going on vacation, and his supervisor would take over the case. Umetiti and Nurse Perkins reported their findings to Umetiti's supervisor that same day. On July 1, 2009, the Division

received the report of the drug screening tests performed on Vivian and J.V.. The results were negative.

II

## July 16, 2009 Assault on Baby Jesse

On July 16, 2009, Vivian dropped her son off at her father's house to report to work. The Division-sponsored case plan had expired by then. No one from the Division had checked on Baby Jesse from June 26, 2009 to July 16, 2009. Vivian testified that she was aware the case plan had expired on June 30, 2009, but she nevertheless continued to follow it as modified. Ugo and Linda agreed to substitute for plaintiff and assumed the responsibility to care for Baby Jesse at night while Vivian was at work. Linda testified that no one from the Division ever spoke to her about any concerns associated with leaving the baby with J.V.. Furthermore, Linda also claimed neither Vivian nor Ugo told her about these concerns.

Vivian's testimony corroborated Linda's understanding of the role she and her husband Ugo were expected to play in assisting Vivian with the care of Baby Jesse.

Vivian conceded that she never saw her father or his wife actually look at the case plan or read its content; she also never told them why the case plan had been put into place.

On July 16, 2009, Vivian was uncharacteristically running late to pick up her son from Linda's house. She called her father at his work and told him she would be late because her relief had not yet arrived. She asked him if Linda could watch the baby a little longer, until she arrived home. Ugo testified that after he spoke to his daughter, he called his wife Linda and told her to "hold the baby until [Vivian] gets there to pick him up."

A short time thereafter, Vivian received a phone call from Linda. Vivian testified as to the content of this telephone conversation and the tragic chain of events that followed it:

> VIVIAN: [Linda] told me she wanted to wash the car, so it was too sunny, since it was summer outside, and she didn't want to leave the baby in the sun too much -- too long. So she asked if she could leave the baby with [J.V.].
>
> Q. So, she called you back in order to ask your permission?
>
> VIVIAN: Well, she was letting me know that if I were to come within a certain amount of time that she would leave the baby . . . she was asking me, yes, to leave the baby with [J.V.].
>
> . . . .
>
> Q. And did you tell her it was okay or not?
>
> VIVIAN: I did tell her it was okay.
>
> Q. And -- how long did you think it was going to be before you got home?

VIVIAN: I hoped within 20 minutes. But I said a little less than the actual time, just so it [didn't] seem that long.

Q. All right. And . . . then you received a subsequent call while you were going home. Is that right?

VIVIAN: Yes.

Q. From your dad?

VIVIAN: Yes.

Q. He told you to go to the hospital?

VIVIAN: Yes.

Q. Something had happened?

VIVIAN: Yes.

III

The Statutory Framework of The DCPP

The Division's "statutory mission is to protect the health and welfare of the children of this state." N.J. Div. of Youth & Family Servs. v. E.B., 137 N.J. 180, 184 (1994) (citing N.J.S.A. 30:4C-4). In carrying out this great responsibility, the Division's paramount concern is the safety of the children it serves, and its primary consideration is the children's best interests. N.J.S.A. 9:6-8.8(a). The Legislature enacted our State's child-welfare laws to strike a balance between two competing public policy interests: a parent's constitutionally protected right "to raise a child and maintain a relationship

with that child, without undue interference by the state," and "the State's <u>parens</u> <u>patriae</u> responsibility to protect the welfare of children." <u>N.J. Div. of Youth & Family Servs. v. A.L.</u>, 213 <u>N.J.</u> 1, 18 (2013) (citations omitted).

To safeguard these interests, the Legislature enacted two parallel statutory schemes: Title 9 and Title 30. <u>Ibid.</u> Title 9 is intended to address cases in which children are abused and neglected. <u>N.J. Div. of Youth & Family Servs. v. P.W.R.</u>, 205 <u>N.J.</u> 17, 31 (2011). Its "overriding purpose . . . is to assure that the lives of innocent children are immediately safeguarded from further injury and possible death and that the legal rights of such children are fully protected." <u>N.J. Div. of Child Prot. & Permanency v. E.D.-O.</u>, 223 <u>N.J.</u> 166, 187 (2015) (internal quotation marks omitted) (quoting <u>N.J.S.A.</u> 9:6-8.8(a); <u>State v. P.Z.</u>, 152 <u>N.J.</u> 86, 96—99 (1997)).

Title 9 also imposes a duty on the State to protect children "who have had serious injury inflicted upon them by other than accidental means." <u>N.J.S.A.</u> 9:6-8.8(a). Although the statute authorizes the removal of children from their homes when such removal is in their best interests, the Division is also obligated to determine what reasonable efforts can be made to keep families unified without compromising the children's safety.

> In any case in which the division accepts a child in care or custody, the division shall make reasonable efforts, <u>prior to placement</u>, to preserve the family in order to prevent the need for removing the child from his home. <u>After placement</u>, the division shall make reasonable efforts to make it possible for the child to safely return to his home.
>
> [<u>N.J.S.A.</u> 9:6-8.8(b)(2) (emphasis added).]

Thus, whether prior to or after a child's removal, the Division remains legally bound to explore any reasonable measures that may accomplish the twin goals of ensuring child safety and promoting family unity.

Upon receipt of a report of child abuse under <u>N.J.S.A.</u> 9:6-8.10, the Division is obligated to respond and

> immediately <u>take such action as shall be necessary to insure the safety of the child</u> and to that end may request and shall receive appropriate assistance from local and State law enforcement officials. A representative of the division or other designated entity shall initiate an investigation within 24 hours of receipt of the report, unless the division or other entity authorizes a delay based upon the request of a law enforcement official.
>
> [<u>N.J.S.A.</u> 9:6-8.11 (emphasis added).]

Thus, the Division, acting through its caseworkers, has the statutory authority to take the measures required to ensure the child's safety, including removing the child involuntarily from the custody of his or her biological parents or legal

guardian(s) on an emergent basis.[8]  N.J.S.A. 9:6-8.18.  This form of protective custodial arrangement cannot "exceed three court days[]" and can be terminated earlier "at the <u>discretion</u> of the reporting physician, <u>director or appropriate official of the Division</u>[,] . . . or upon order of the court."  N.J.S.A. 9:6-8.19(c) (emphasis added).

Once the Division involuntarily removes a child from the custody of a parent or legal guardian, <u>Rule</u> 5:12-1(a) requires the Division to bring a complaint for removal as a summary proceeding pursuant to <u>Rule</u> 4:67.  <u>N.J. Div. of Youth & Family Servs. v. J.Y.</u>, 352 <u>N.J. Super.</u> 245, 258—59 (App. Div. 2002).  At this procedural phase, the Division must prove to the Family Part, by a preponderance of the evidence, that:

> 1) the parent or other person legally responsible for the child's care is absent or, though present, was asked and refused to consent to the temporary removal of the child and was informed of an intent to apply any order applicable under this section [of the statute];
>
> 2) the child appears so to suffer from abuse or neglect of his parent or guardian that his immediate removal is necessary to avoid imminent danger to the child's life, safety or health; [and]

---

[8] The Division's authority to take emergent custody of a child is known as a "Dodd removal."  <u>See</u> <u>P.W.R.</u>, <u>supra</u>, 205 <u>N.J.</u> at 26 n.11.

3) there is not enough time to hold a preliminary hearing.

[Ibid. (quoting N.J.S.A. 9:6-8.28).]

Title 30 provides the legal framework for guardianship proceedings through which the Division may seek to terminate parental rights. See N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 110—11 (2011). Our Supreme Court recently examined the multi-step process the Division must undertake under Title 30 to "intervene with a family in need of its assistance[.]" N.J. Div. of Youth and Family Servs. v. I.S., 214 N.J. 8, 34, cert. denied, ___ U.S. ___, 134 S. Ct. 529, 187 L. Ed. 2d 380 (2013). That process may also lead to the involuntary "removal of a child from the custodial parent and placement in the Division's custody." Ibid. The Court noted that "the initial step involves a referral to the Division," which "must be of a specific sort[.]" Ibid. This initial complaint may be made by "any person" when it "appear[s]" that a child's parent or lawful guardian is "unfit" or has failed "to ensure the health and safety of the child, or is endangering the welfare of such child[.]" Ibid. (quoting N.J.S.A. 30:4C-12).

When the Division receives such a complaint, it is legally bound to investigate. If circumstances warrant, the Division must afford the child's parent or guardian an opportunity "to file an application for care under N.J.S.A. 30:4C-11, which

would result in converting the matter into a voluntary placement. On the other hand, <u>if a parent or guardian acts to impede the Division's investigation</u>, the Division may obtain the necessary relief from the family court." <u>Ibid.</u> (emphasis added) (citing <u>N.J.S.A.</u> 30:4C-12).

Once it has completed the investigation, the Division must determine whether "the child requires care and supervision by the [D]ivision or other action to ensure the health and safety of the child[.]" <u>Ibid.</u> (quoting <u>N.J.S.A.</u> 30:4C-12). The statute also empowers the Division to apply "to the Family Part of the Chancery Division of the Superior Court in the county where the child resides for an order making the child a ward of the court and placing the child under the care and supervision or custody of the [D]ivision." <u>Ibid.</u> (quoting <u>N.J.S.A.</u> 30:4C-12). The Family Part thereafter may discharge its parens patriae responsibility while providing the due process of law necessary to protect both the child and his or her parent or legal guardian from undue governmental interference.

Here, Umetiti and his supervisor were charged with determining whether a four-month-old infant was at risk of continued harm from his father, based on his bruised cheek and bloodshot eyes. The record shows the infant's parents sought timely medical attention. The child's eighteen-year-old

mother's genuine concern for her baby's well-being was never in question. Moreover, the father, who was in his early twenties, cooperated with the Division's investigation. The child's maternal grandmother alleged the child's father was abusive to her daughter; she also suspected he was responsible for the child's injuries and alleged he was suffering from bipolar disorder.

The medical staff who examined the baby at the hospital suspected child abuse as a possible cause of the injuries, but were not definitive in their diagnosis. Umetiti was required to respond to this situation and apply his training and experience to make a tentative, inherently discretionary decision on how to proceed. The first phase of this multi-step process is investigatory. Umetiti began his investigation by interviewing the relevant parties and reaching a preliminary conclusion that Baby Jesse was not at immediate risk of harm from his father. Umetiti marshalled the family's resources and put in place a voluntary case plan that expressly relied on the cooperation and good will of all involved. The Division also convinced the child's parents to submit to a substance assessment, which showed negative results for illicit substances.

This investigation shows that Umetiti and Perez's decisions and the steps they took to address the situation were

objectively reasonable.   There is also no reason to question that these two Division employees acted with subjective good faith.

IV

<u>The Tort Claims Act</u>

The Legislature adopted the TCA in response to the Supreme Court's abrogation of sovereign immunity under our common law. <u>See</u> <u>Willis v. Dep't of Conservation & Econ. Dev.</u>, 55 <u>N.J.</u> 534, 540—41 (1970).   The Legislature intended the TCA "to serve as a comprehensive scheme that seeks to provide compensation to tort victims without unduly interfering with governmental functions and without imposing an excessive burden on taxpayers."   <u>Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ.</u>, 226 <u>N.J.</u> 297, 308 (2016) (internal quotation marks omitted) (quoting <u>Bernstein v. State</u>, 411 <u>N.J. Super.</u> 316, 331 (App. Div. 2010)).   Thus, in reviewing plaintiff's cause of action, we are "guided by the principle that 'immunity for public entities [under the TCA] is the general rule and liability is the exception.'"   <u>Ibid.</u> (quoting <u>Kemp by Wright v. State</u>, 147 <u>N.J.</u> 294, 299 (1997)).

The words of Chief Justice Weintraub, written more than half a century ago, capture the essence of the TCA's underlying public policy:

> A private entrepreneur may readily be held [liable] for negligent omissions within the

32

chosen ambit of his activity. But the area within which [the] government has the power to act for the public good is almost without limit, and the State has no duty to do everything that might be done. Rather[,] there is a political discretion as to what ought to be done, as to priorities, and as to how much should be raised by taxes or borrowed to that end. If [the] government does act, then, when it acts in a manner short of ordinary prudence, liability could be judged as in the case of a private party. So if a road were constructed of a design imperiling the user, the issue of fault would present no novel problem. But whether a road should have four or six or eight lanes, or there should be dividers, or circles or jughandles for turns, or traffic lights, or traffic policemen, or a speed limit of 50 or 60 miles per hour -- such matters involve discretion and revenue and are committed to the judgment of the legislative and executive branches. As to such matters, the question is whether a judge or jury could review the policy or political decisions involved without in effect taking over the responsibility and power of those other branches.

[Fitzgerald v. Palmer, 47 N.J. 106, 109—10 (1966) (citation omitted).]

Thus, the State's immunity from civil liability is not predicated on a notion of infallibility, but on the judiciary's inability to enforce any judgment it may render. Id. at 108. The judiciary does not have the constitutional authority to order the Legislature to appropriate public funds to pay a judgment; nor can it issue a writ of execution upon state-owned property. Ibid. (citations omitted). These fundamental aspects

of our system of government form the guiding principles for determining the applicability of the TCA to this cause of action.

As our description of the Division's statutory framework reveals, the circumstances we confront here directly implicate the immunity the TCA confers on the employees of a governmental agency whose sole role is to enforce our State's child protection laws. Umetiti and Perez's authority to investigate child abuse allegations and/or remove a child from his home are carefully and expressly circumscribed by the Legislature and subject to judicial scrutiny. The sole basis upon which these employees could have removed Baby Jesse was through the legal authority provided in Title 9 and Title 30.

V

### Qualified Immunity

The TCA provides a public employee with immunity for "an injury caused by his adoption of or failure to adopt any law or by his failure to enforce any law." N.J.S.A. 59:3-5; see also Bombace v. Newark, 125 N.J. 361, 366 (1991) (quoting N.J.S.A. 59:3-5). This immunity is absolute, thus requiring the dismissal of a plaintiff's cause of action. Reaves v. Dep't of Law & Pub. Safety, Div. on Civil Rights, 303 N.J. Super. 115, 120 (App. Div.), certif. denied, 152 N.J. 12 (1997); Bombace,

34

supra, 125 N.J. at 373—74.  However, because defendant did not raise absolute immunity under N.J.S.A. 59:3-5 as a defense, we will address the issues under the qualified immunity standard in N.J.S.A. 59:3-3.

In contrast to N.J.S.A. 59:3-5, N.J.S.A. 59:3-3 provides qualified immunity with respect to the enforcement of a law:  "A public employee is not liable if he acts in good faith in the execution or enforcement of any law."  The qualified immunity afforded by N.J.S.A. 59:3-3 has two components.  A public employee is entitled to this immunity if the employee can establish either that his or her conduct was "objectively reasonable" or that he or she acted with subjective good faith. Fielder v. Stonack, 141 N.J. 101, 131—32 (1995) (citations omitted).  In determining whether an employee has established qualified immunity under N.J.S.A. 59:3-3, the court applies the same standards of objective reasonableness that are used in federal civil rights cases.  Id. at 131—32; see also Wildoner v. Borough of Ramsey, 162 N.J. 375, 387 (2000).  If there are disputed facts that underlie the claim, the TCA's applicability may require submission to a jury.  Fielder, supra, 141 N.J. at 132 (quoting Evans v. Elizabeth Police Dep't, 236 N.J. Super. 115, 117 (App. Div. 1983)).

A defendant's entitlement to qualified immunity based on objectively reasonable conduct "is a question of law to be decided [as] early in the proceedings as possible, preferably on a properly supported motion for summary judgment or dismissal." See Wildoner, supra, 162 N.J. at 387 (referring to qualified immunity claims under 42 U.S.C. § 1983 and observing that the same standards apply to questions of objective reasonableness under N.J.S.A. 59:3-3); Fielder, supra, 141 N.J. at 131—32 (stating public employees are entitled to summary judgment under N.J.S.A. 59:3-3 if they can establish that their conduct was objectively reasonable).

A court must examine whether the actor's allegedly wrongful conduct was objectively reasonable in light of the facts known to him or her at the time. State v. Shannon, 222 N.J. 576, 602 (2015) (quoting State v. Handy, 206 N.J. 39, 46—47 (2011), cert. denied, ___ U.S. ___, 136 S. Ct. 1657, 194 L. Ed. 2d 800 (2016). Objective reasonableness will be established if the actor's conduct did not violate a clearly established constitutional or statutory right. Gormley v. Wood-El, 218 N.J. 72, 113 (2014) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982)).

Given the undisputed facts we have described at length, we are satisfied Umetiti and Perez are covered by the qualified

immunity in <u>N.J.S.A.</u> 59:3-3. Umetiti did not fail to enforce the provisions of Title 9 and Title 30. He undertook a course of action sanctioned by the statutory authority conferred to the Division under the circumstances. Given the child's physical condition on May 28, 2009, and the availability of his family's support, there was no legal basis to consider, much less execute, a Dodd removal. Even if the Division had unilaterally taken such a drastic and legally unwarranted action, we are satisfied, as a matter of law, that the Family Part would have ordered the Division to return the child to his parents. The terms of the case plan mediated by the Division addressed all of the concerns known to Umetiti at the time.

In the interest of clarity, we also address defendants' good faith as an alternative basis for applying qualified immunity. A defendant who cannot establish that his or her conduct was objectively reasonable may still invoke qualified immunity if his or her actions were carried out in good faith. <u>Fielder</u>, <u>supra</u>, 141 <u>N.J.</u> at 132 (citations omitted). Ordinarily, the issue of good faith will require a plenary hearing to assess the claim's subjective elements. <u>Canico v. Hurtado</u>, 144 <u>N.J.</u> 361, 365 (1996) (citing <u>Fielder</u>, <u>supra</u>, 141 <u>N.J.</u> at 132). Under these circumstances, however, a public

employee who establishes he performed his actions in good faith is entitled to summary judgment as a matter of law. Ibid.

This court has previously reviewed the application of qualified immunity to the conduct of Division caseworkers, based on the good faith provision in N.J.S.A. 59:3-3. In B.F. v. Div. of Youth & Family Servs., 296 N.J. Super. 372 (App. Div. 1997), the plaintiffs sought monetary damages for alleged violations of the Federal Civil Rights Act, 42 U.S.C. § 1983; the New Jersey Constitution; and various common law torts. Id. at 377. The factual basis for the plaintiffs' cause of action was not disputed. The Supreme Court was highly critical of the actions the Division took during the underlying guardianship case filed to terminate the plaintiffs' parental rights:

> We are compelled to note that much of the bonding that has taken place in this case could have been avoided if the [Division] had correctly followed its mandate to use due diligence and its best efforts to reunite children with their natural parents. N.J.S.A. 30:4C-15; [N.J.S.A.] 30:4C-58. When B.F. requested that K.L.F. be returned to her custody, the child had been with her current foster parents for only a month. When DYFS petitioned for guardianship in March 1991, the child had been with the foster parents for ten months. Regrettably, litigation has extended that period even more. By encouraging her foster parents to believe that K.L.F. was on the way to becoming their child, and to view their interests and those of the child as being opposed to her reunification with her biological parent, DYFS may have increased

the amount of bonding that has occurred. That those in the child welfare system not tip the scales and encourage a foster parent-child bond to develop when the natural parent is both fit and anxious to regain custody is essential. <u>Indeed, we suspect that if the [Division] had allowed visitation and begun a process of reuniting B.F. with her daughter, it could have helped create a bond between the daughter and her mother that would have greatly mitigated any harm from being removed from foster parents</u>.

[<u>In re Guardianship of K.L.F.</u>, 129 <u>N.J.</u> 32, 45—46 (1992) (emphasis added).]

Despite these highly critical comments by our Supreme Court, we held the Division caseworkers in <u>B.F.</u> were entitled to qualified immunity under <u>N.J.S.A.</u> 59:3-3 because the Court's criticism "[did] not amount to charges of 'crime, actual fraud, actual malice[,] or willful misconduct.' . . . <u>They are at most assertions of negligence</u>." <u>B.F.</u>, <u>supra</u>, 296 <u>N.J. Super.</u> at 385—86 (emphasis added) (quoting <u>N.J.S.A.</u> 59:3-14).[9] Relying on <u>Fielder</u>, <u>supra</u>, 141 <u>N.J.</u> at 123—25, we reaffirmed "that ordinary negligence is an insufficient basis for holding liable a public employee involved in the execution of the law under <u>N.J.S.A.</u> 59:3-3." <u>B.F.</u>, <u>supra</u>, 296 <u>N.J. Super.</u> at 386. A public

---

[9] In pertinent part, <u>N.J.S.A.</u> 59:3-14(a) provides as follows: "Nothing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted a crime, actual fraud, actual malice or willful misconduct."

employee's good faith under N.J.S.A. 59:3-3 is "to be judged in relation to whether his act violated N.J.S.A. 59:3-14 in that it involved 'crime, actual fraud, actual malice[,] or willful misconduct.'" Ibid. (citing Brayshaw v. Gelber, 232 N.J. Super. 99, 110 (App. Div. 1989); Hayes v. Mercer County, 217 N.J. Super. 614, 619—20 (App. Div.), certif. denied, 108 N.J. 643 (1987)).

Here, the devastating physical injuries and permanent cognitive harm to Baby Jesse were caused by the criminal conduct of his biological father, not by a Division caseworker's good faith efforts to carry out his statutory responsibilities.

While serving in the Law Division, Judge Charles E. Villanueva[10] considered the application of good faith immunity to a convoluted cause of action filed against a number of public defendants, including Division caseworkers, investigators from the Attorney General's Office, and sitting Superior Court judges. The plaintiffs relied on multiple theories of liability to support the mother's complaint that the father had sexually abused their four-year-old daughter. Delbridge v. Schaeffer, 238 N.J. Super. 323, 328—29 (Law Div. 1989), aff'd sub. nom., A.D. v. Franco, 297 N.J. Super. 1 (App. Div. 1993), certif.

---

[10] Judge Villanueva served in the Appellate Division from 1992 to 1996.

denied, 135 N.J. 467, cert. denied, 513 U.S. 832, 115 S. Ct. 108, 130 L. Ed. 2d 56 (1994).

Judge Villanueva granted summary judgment in favor of the Division caseworkers based on the qualified immunity provided by N.J.S.A. 59:3-3. He found the caseworkers' conduct was objectively reasonable. Id. at 347—50. All of their actions were carried out in the execution and enforcement of the laws pertaining to child abuse. Id. at 346—48. Judge Villanueva provided the following incisive observations that are highly relevant to the circumstances we face here:

> If these defendants were not immune and were obliged to defend their actions in a civil trial (and litigate the same issues already litigated, decided and currently on appeal), a most chilling effect would be visited upon them. When others in the field of preventing child abuse learn of this case, it could have a catastrophic effect if persons, such as these defendants, were held not to be immune. What reasonable DYFS employee, in deciding whether to pursue an allegation of child abuse, would fail to ask himself whether he wants to end up at risk in a similar lawsuit? What is worse, it is precisely in those cases (unlike this case) where the indications of abuse are subtle or sketchy -- and, thus, most in need of investigation -- that the chilling effect of such a decision will be felt most.
>
> [Id. at 348—49.]

Judge Villanueva's admonitions are tragically illustrated in this case. The potential tort claims arising from a

41

particularly vulnerable class of litigants can be fiscally ruinous. The Division is uniquely responsible for protecting the State's children from abuse and neglect. The Legislature adopted the TCA to protect public funds from being diverted to underwrite the cost of civil liability in these type of cases. The Division employees named as defendants in this case are entitled to immunity under N.J.S.A. 59:3-3 because the record shows their conduct was objectively reasonable. Alternatively, defendants are entitled to qualified immunity because they acted with subjective good faith in carrying out their statutory responsibilities. Our holding based on qualified immunity under N.J.S.A. 59:3-3 obviates the need to address defendants' remaining arguments. For these same reasons, we also deny plaintiff's cross-appeal. We thus vacate the final judgment entered against defendants for $165,972,503, plus $1,432,872.81 for satisfaction of Medicaid claims.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3717-13T2