# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1773-18T1
                A-1774-18T1

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.G. and A.T.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.K.T.,

     a Minor.

_____

Submitted October 2, 2019 – Decided October 9, 2019

Before Judges Fasciale, Rothstadt and Mitterhoff.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FG-07-0108-18.

Joseph E. Krakora, Public Defender, attorney for appellant N.G. (Deric D. Wu, Assistant Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for appellant A.T. (Robyn A. Veasey, Deputy Public Defender, of counsel; Kisha M. Hebbon, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Katherine Anne Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor A.K.T. (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

In these consolidated appeals, A.T. (the father) and N.G. (the mother) (collectively defendants) appeal from two orders, dated December 5, 2018. One entered a guardianship judgment terminating their parental rights to their son A.K.T. (the child); the other order denied their motion for a change in placement of the child. Following the guardianship trial, Judge James R. Paganelli entered the order terminating their parental rights and rendered a comprehensive twenty-seven page written opinion. The judge also conducted a hearing and provided a detailed thirty-seven page written decision denying defendants' motion for change of placement of the child. The father appeals only the trial court's

judgment terminating his parental rights and awarding the Division of Child Protection and Permanency (the Division) guardianship over the child. He argues that the Division failed to satisfy each prong under the best interests test, N.J.S.A. 30:4C-15.1. The mother appeals only the trial judge's decision denying her motion of a change of placement for the child. We affirm.

I.

The child was born on October 31, 2017. On November 1, 2017, after noticing the mother's previous contact with the Division, a hospital social worker notified the Division of the child's birth.[1] Division investigators arrived at the hospital and met with the mother, her sisters, the father, and the father's sister, S.T. The mother presented the Division investigator with what she explained was a notarized letter granting guardianship of the child to her sister. The father's sister, S.T., told the investigator that she was willing to care for the child, as she was a licensed resource parent. When the investigator spoke with

---

[1] The mother has a history with the Division, and she has several other children, none of whom are in her custody; the mother's parental rights to two other children were terminated, and she surrendered her rights to a third child, K.G. The father is also the biological father of K.G. His parental rights to K.G. were terminated after trial, and we affirmed that decision. N.J. Div. of Child Prot. & Permanency v. A.T., No. A-2848-17 (App. Div. Apr. 18, 2019).

the father, the father also stated that he wanted his sister to be assessed as the child's relative resource.

On November 8, 2017, the Division filed a verified complaint for guardianship of the child. That same day, the court issued an Order to Show Cause for temporary custody. The mother told a Division caseworker that she understood she would not have custody of the child, and she wanted to discuss adoption. On November 15, 2017, the Division placed the child with the father's sister, S.T. On January 31, 2018, the mother informed a Division caseworker that she wished to surrender her rights to the child to K.T., the foster parent to her other child, K.G. But several months later, she advised the Division that she wanted to surrender her rights to S.T., who was caring for the child at the time. On April 10, 2018, the FN litigation was terminated, and the FG litigation commenced.

On May 29, 2018, the Division learned that S.T.'s home was involved in two shootings, and it removed the child from the home. That day, Division caseworker, Latoya Bowers, visited S.T.'s home for a regular monthly visit. When she arrived, she noticed a police vehicle in front of the house. As she approached the home, Bowers noticed a small hole near the doorknob. When Bowers entered the home, S.T. explained that there was a shootout in her house.

S.T. showed bullet holes throughout the house to Bowers, including in S.T.'s bedroom where the child slept. S.T. told Bowers that her son was sitting on the porch when he noticed two men running toward the home, at which point he ran into the house, and shut the door. Then, they heard the gunshots. S.T. stated that she did not know the shooters and did not know why they shot at her house. But S.T. also stated that this was the second shooting at the home. Several days earlier, a vehicle pulled in front of the house and shot at her daughter's car. S.T. did not report either shooting to the Division.

Immediately thereafter, Bowers discussed the situation with her supervisor, office manager, and the area director, and she initiated the child's removal and placed him with K.T. On July 23, 2018, the Division mailed a "rule-out" letter to S.T. and explained that the child would remain with K.T. At the time of the placement hearing in November 2018, K.T. was in the process of adopting the child's biological sister, K.G., and she was also committed to adopting the child.

The guardianship trial took place on October 1, October 9, and October 25, 2018. At trial, Dr. Peter DeNigris, a clinical psychologist, testified for the Division and discussed his findings from two psychological evaluations he conducted on the father. Dr. DeNigris noted the father's substance abuse issue,

his history of noncompliance with substance abuse treatment, and his minimization of his substance abuse problem. Dr. DeNigris also emphasized the father's poor judgment, as exemplified by his lengthy criminal history. The father estimated that he had been arrested and incarcerated on fifteen different occasions, with charges including distribution of cocaine, possession of marijuana, possession of a gun, violation of probation, assault, and domestic violence in his relationship with the mother. Dr. DeNigris concluded that "[g]iven the ongoing nature of [the father's] poor judgment and unresolved substance use and criminal behaviors, children placed into his care would be at risk of harm and/or neglect." Dr. DeNigris did not conduct an evaluation of the mother because she did not attend the appointment. The Law Guardian did not present any evidence and supported the Division's application for guardianship.

Throughout the FG litigation, defendants sought to have the child returned to S.T. When the FG trial concluded, the judge conducted a hearing on defendants' motion for change of placement on November 13, November 15, and November 27, 2018. K.T., S.T., and caseworker Bowers testified at the hearing.

On December 5, 2018, the judge issued separate written decisions terminating defendants' parental rights and denying their motion for a change in placement. The judge found that the Division proved by clear and convincing

evidence all four prongs of the best-interests test under N.J.S.A. 30:4C-15.1(a). The judge also upheld the Division's decision to remove the child from S.T.'s home and place the child in K.T.'s custody alongside his biological sister. The judge concluded that the Division's decision to remove the child and place him with K.T. was not arbitrary, capricious, or unreasonable. The judge also independently found that it was in the best interests of the child to be placed with K.T.

II.

We begin our discussion with the well-settled legal framework regarding the termination of parental rights. Parents have a constitutionally protected right to the care, custody and control of their children. Santosky v. Kramer, 455 U.S. 745, 753 (1982); In re Guardianship of K.H.O., 161 N.J. 337, 346 (1999). However, that right is not absolute. N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 553 (2014); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599 (1986). At times, a parent's interest must yield to the State's obligation to protect children from harm. N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 397 (2009); In re Guardianship of J.C., 129 N.J. 1, 10 (1992). To effectuate these concerns, the Legislature created a test for determining when parental rights must be terminated in a child's best interests. In order to obtain

7

parental termination, N.J.S.A. 30:4C-15.1(a) requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

See also A.W., 103 N.J. at 604-11. The four prongs of the test are not "discrete and separate," but "relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348. "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the

specific circumstances in the given case."   Ibid. (quoting In re Adoption of Children by L.A.S., 134 N.J. 127, 139 (1993)).

Our review of a family judge's factual findings is limited.   Cesare v. Cesare, 154 N.J. 394, 413 (1998).  "When a biological parent resists termination of his or her parental rights, the [trial] court's function is to decide whether that parent has the capacity to eliminate any harm the child may already have suffered, and whether that parent can raise the child without inflicting any further harm."  N.J. Div. of Youth & Family Servs. v. R.L., 388 N.J. Super. 81, 87 (App. Div. 2006).  The factual findings, which support such a judgment, "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice,' and should be upheld whenever they are 'supported by adequate, substantial and credible evidence.'"  In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993) (quoting Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 483-84 (1974)).  "[T]he conclusions that logically flow from those findings of fact are, likewise, entitled to deferential consideration upon appellate review."  R.L., 388 N.J. Super. at 89.

III.

We now turn to the father's argument that the judge erred in finding that the Division proved by clear and convincing evidence each of the four prongs under the best interests test.

A.

The father asserts that there was no substantial, credible evidence in the record to find the child's safety, health, or development was or would continue to be endangered by the parental relationship. He asserts that the Division presented "absolutely no evidence" that he abused or neglected the child, and as a result, there was no basis to find that the Division satisfied the first prong of the best interests test.

As a threshold matter, the father argues that the Division presented no evidence of abuse or neglect. But this argument is misguided. The Division sought to terminate his parental rights under Title 30, which "provides the legal framework for guardianship proceedings through which the Division may seek to terminate parental rights." N.E. for J.V. v. State Dep't of Children & Families, Div. of Youth & Family Servs., 449 N.J. Super. 379, 400 (App. Div. 2017). "Title 9 is intended to address cases in which children are abused and neglected." Id. at 398. The Division was not attempting to remove the child based on abuse

or neglect under Title 9. The father's parental rights were terminated under Title 30, and thus, Title 9 is inapplicable and the Division did not have to prove abuse or neglect.

The first prong of the best interests test requires the Division demonstrate that the "child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1); K.H.O., 161 N.J. at 352. The Division must prove that the child's health and development were threatened and will continue to be affected by the parent-child relationship. K.H.O., 161 N.J. at 348. The concern is not only with actual harm to the child, but also the risk of harm. In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999). The focus is not on a single or isolated event, but rather on the effect "of harms arising from the parent-child relationship over time on the child's health and development." K.H.O., 161 N.J. at 348. However, the court does not need to wait "until a child is actually irreparably impaired by parental inattention or neglect" to find child endangerment. D.M.H., 161 N.J. at 383 (citing A.W., 103 N.J. at 616 n.14). And the Court has explained that a parent's withdrawal of nurture and care for an extended period of time is a harm that endangers the health of a child. Id. at 379. When children "languish in

foster care" without a permanent home, their parents' "failure to provide a permanent home" may itself constitute harm. Id. at 383.

The judge found Dr. DeNigris was credible and noted Dr. DeNigris' conclusion that the father was "not fit to parent [the child] currently or in the foreseeable future." The judge noted the factors Dr. DeNigris used to support his conclusion that the father was not fit to parent the child:

> (1) extensive history of poor judgment that includes substance abuse and criminal activities; (2) failure to complete substance abuse treatment, despite ample time to address his issues, and his statement that no services would benefit him, are indicators that he would not successfully follow through with treatment and, therefore, his long-term struggle with substance abuse remains unresolved; (3) [the father] accepted minimal responsibility (placed sole blame on [the mother], lack of residential and financial stability) for [the child's] placement into foster care; (4) continues to lack knowledge of child development; (5) the results of the psychological testing suggest that (a) he was reluctant to recognize his minor faults and typically views himself as a stable, confident and self-satisfied individual, (b) tends to be wary and sensitive in his interpersonal relationships, (c) substance abuse has led to problems in his life such as strained interpersonal relationships, vocational and/or legal problems, and using substances to manage stress.

The judge also found that the father's contradictory statements, seeking reunification and surrendering his rights to the child, "calls into question his commitment to being a consistent and permanent caretaker to his son." The

A-1773-18T1

judge noted that the father had "ample time" to address the factors that made him an unsuitable caretaker of his older child, K.G., yet he made "no substantive progress."

Accordingly, there exists substantial credible evidence to find that the Division satisfied the first prong under N.J.S.A. 30:4C-15.1(a).

B.

Next, the father contends that the Division presented insufficient evidence that he was unwilling or unable to eliminate any harm the child faced or provide a safe and stable home for the child. He asserts that he could improve his problems – such as his substance abuse issues and lack of independent housing – if the Division provided him the proper amount of assistance.

The second prong of the best interests test requires the Division to present clear and convincing evidence that "[t]he parent is . . . unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). The relevant inquiry for the trial court is whether the parent has cured and overcome the initial harm that endangered the child, and the parent is able to continue the parental relationship without recurrent harm to the child. K.H.O., 161 N.J. at 348-49. To satisfy its burden, the Division must show continued harm to the child

because the parent is unable or unwilling to overcome or remove the harm. N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 483 (App. Div. 2012). The first and second prongs relate to one another and, often, "evidence that supports one informs and may support the other as part of the comprehensive basis for determining the best interests of the child." D.M.H., 161 N.J. at 379.

"Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." K.H.O., 161 N.J. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Keeping [a] child in limbo, hoping for some long term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Family Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

The judge found the Division established by clear and convincing evidence that the father is unwilling or unable to eliminate the harm posed to the child. The judge noted Dr. DeNigris' opinion that the father had ample time to remedy the numerous factors that made him an unfit parent to his other children, yet he was unwilling or unable to do so. Dr. DeNigris conducted two psychological evaluations on the father: one in October 2017 and another in July 2018. In his report based on the evaluation in October 2017, Dr. DeNigris noted

the father's criminal history, substance abuse history, and his housing and employment troubles. At the evaluation, the father told Dr. DeNigris that he had not worked in the past month, and he could not keep up with his rent and child support so "[i]t didn't make sense to go to work." The father explained that he had no source of income, but he received food stamps. He stated that he planned to get a job "in the future" when he moved to Florida with his girlfriend.

In July 2018, Dr. DeNigris evaluated the father again, and he concluded that the father was unfit to parent the child. In his report, Dr. DeNigris concluded that the father was "largely in the same position as he was when [he] last evaluated [him] in 2017." Dr. DeNigris emphasized that the father had not made any substantive progress, despite the time between the two evaluations.

Moreover, as to his housing, the father told the Division caseworker – one week before the guardianship trial – that he was living in a shelter. As to his substance abuse issues, the father enrolled in substance abuse programs, but he was unable to successfully complete them. He received three separate Division referrals, but he failed to finish any treatment. He attended the programs sporadically and was discharged.

In sum, the judge found that the father's "extensive untreated substance abuse history, a lengthy criminal background, a lack of knowledge regarding

child development, and a need to attain stable housing and consistent employment" supported a finding that the father was unable to provide a safe and stable home for the child. The judge did not find that a delay in permanent placement would contribute to the harm or that "[s]uch harm may include evidence that separating the child from [his] resource family parents would cause serious and enduring emotional or psychological harm to the child," pursuant to N.J.S.A. 30:4C-15.1(a)(2), because no bonding evaluations were conducted due to the child's young age. Although the father argues that he could become a fit parent with more supportive services from the Division, the father had nearly a year to address the issues noted in Dr. DeNigris' first evaluation, but he failed to make any substantial progress. The child should not be kept "in limbo, hoping for some long term unification plan." A.G., 344 N.J. Super. at 438. Accordingly, the judge's decision is supported by substantial credible evidence in the record.

C.

The father contends that the Division failed to provide him with reasonable reunification services. Specifically, the father argues that the Division failed to offer him housing assistance.

The third prong requires evidence that "[t]he [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts may include consultation with the parent, developing a plan for reunification, providing services essential to the realization of the reunification plan, informing the family of the child's progress, and facilitating visitation." N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281 (2007) (internal quotation marks and citations omitted). However, "the [D]ivision shall not be required to provide reasonable efforts to reunify the child with a parent if a court of competent jurisdiction has determined that . . . [t]he rights of the parent to another of the parent's children have been involuntarily terminated." N.J.S.A. 30:4C-11.3(c). The father's parental rights to his other children, namely the child's biological sister, K.G., were involuntarily terminated after trial, and therefore, the court properly relieved the Division of its obligations under the third prong of the best interests test.

Nevertheless, on appeal, the father argues that his parental rights to his other children were involuntarily terminated not because of his actions, but due to the children's mothers' actions. He asserts that because the children's mothers

17

were the subjects of the Division referrals, the Division was obligated to assist him with independent housing. We disagree. The statute clearly states that the Division is not required to provide reasonable reunification efforts if the parent's parental rights were involuntarily terminated to another child. That is the case here, and consequently, the Division was properly relieved of its obligations.

D.

Lastly, the father contends that the Division failed to present clear and convincing evidence demonstrating that the good to be achieved by termination of parental rights will outweigh the harm.

The fourth prong of the best interests test requires a determination that the termination of parental rights "will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4). The court must ask whether "after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with [his] natural parents than from the permanent disruption of [his] relationship with [his] foster parents." K.H.O, 161 N.J. at 355. This prong "cannot require a showing that no harm will befall the child as a result of the severing of biological ties." Ibid. "The overriding consideration under this prong remains the child's need for permanency and stability." L.J.D., 428 N.J. Super. at 491-92. "Ultimately, a child has a right to live in a stable, nurturing

environment and to have the psychological security that his most deeply formed attachments will not be shattered." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 453 (2012). "A child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." N.J. Div. of Youth & Family Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004).

The judge said he could not consider the child's relationship with defendants or his foster parents because no bonding evaluation was performed due to the child's young age. However, considering the child's right to a permanent and stable placement, the judge concluded that terminating the father's rights would not do more harm than good. The judge stated that neither the father nor the mother were fit to care for the child. He also noted that the child's resource parent was "capable and loving" and committed to adopting the child. The judge further added that the child could continue to grow his relationship with his biological sister, who was adopted by K.T.

Here, the judge's decision is supported by substantial credible evidence in the record. As indicated by the father's psychological evaluations, he was not a viable parenting option and would not likely become one in the near future. Dr. DeNigris concluded that the father had poor judgment, a criminal history,

untreated substance abuse issues, minimal acceptance of responsibility, and housing and employment issues. Dr. DeNigris stated that there were no services "that would render [the father] capable of parenting" the child in the foreseeable future. Accordingly, the judge's determination that the Division satisfied the fourth prong is supported by substantial credible evidence.

IV.

Finally, we turn to the mother's appeal, in which she argues that it was in the child's best interests to be returned to the care and custody of S.T. She further argues that in the alternative, a comparative bonding evaluation was required to make a placement decision. We reject both arguments and affirm.

"In reviewing a child's placement, courts must determine whether 'such placement ensures the safety and health and serves the best interest of the child.'" N.J. Div. of Youth & Family Servs. v. M.F., 357 N.J. Super. 515, 528 (App. Div. 2003) (quoting N.J.S.A. 30:4C-51). The child's best interests "is always the polestar in such matters." N.J. Div. of Child Prot. & Permanency v. C.S., 432 N.J. Super. 224, 229 (App. Div. 2013). Although the Division has a statutory duty to evaluate relatives as potential caretakers, there is no presumption that favors the child's placement with such relatives. N.J.S.A.

20

30:4C-12.1; <u>N.J. Div. of Youth & Family Servs. v. J.S.</u>, 433 N.J. Super. 69, 81-82 (App. Div. 2013).

Here, S.T. and her household were involved in two shootings: her daughter's car was shot, and, about a week later, the home was shot at and bullets entered the home. The judge noted that S.T. failed to notify the Division of either shooting. The judge further opined that "any suggestion that this was a drive by or random type shooting is dispelled by [S.T.]'s mugshot identification, and the daughter's involvement, which was revealed to [S.T.] on the night of the shooting." S.T. attempted to minimize the shooting by stating that the shooting was outside and only "the car got shot up." The judge concluded that S.T.'s household, including the child, "was directly impacted and at risk."

The judge noted that K.T. provided "care, love and support" for the child. The child was with his sister, and their relationship was described as "loving, caring and growing." The judge concluded that the mother proffered no legal basis as to why the child should be removed from the resource parent. The judge found that "permanency with [K.T.] is in [the child's] best interests: (1) he can grow in a family with his sister [K.G.]; (2) [S.T.]'s failure to visit [the child] since his removal; (3) the manner in which [S.T.] handled the shootings[;] and (4) there is no reason to subject [the child] to another removal." We agree.

Lastly, despite the mother's argument, a bonding evaluation should not have been required due to the child's young age. In support of her argument, the mother cites to N.J. Div. of Child Prot. & Permanency v. C.S., 432 N.J. Super. at 229, for the proposition that when a child is moved from a placement where he has spent a significant amount of time, a bonding evaluation is required to aid the court in determining whether the best interests of the child are served in the new placement. In C.S., we reversed an order transferring placement of a child from her foster home to her grandparents and remanded for an evidentiary hearing "for the development and consideration of bonding evidence." Id. at 227-29. However, we explicitly "reject[ed] the argument that every temporary removal of a child from [a] foster home to a relative's home will require a bonding evaluation[.]" Id. at 229. We noted that under the specific circumstances presented in that case, the judge should not have refused to allow the Law Guardian to present bonding evidence before making the change in placement. Ibid.

Here, as we noted in C.S., there is no bright-line rule that every transfer of placement requires a bonding evaluation, contrary to the mother's argument. The child was removed from S.T.'s home when he was seven months old; he only spent the first seven months of his life with S.T. Dr. DeNigris opined that

22

he could not perform a bonding evaluation because the child was too young. The judge also concluded that "compelling [the child] to sustain another removal from another family is unnecessary and maybe detrimental to him." Accordingly, the judge's decision is supported by substantial credible evidence.

To the extent that we have not addressed the parties' remaining arguments, we conclude that they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION